and I gather that you all have taken this on by court request, is that correct? You have the thanks of the court for the service to the court and your client, and of course our thanks to the government as well. And we're all glad that everyone's being paid again. The next case for the day is Viamedia, Incorporated against Comcast Corporation, Appeal 18-2852. And before you get started, Mr. Panner, what is the sequence with respect to the government's participation in this? I can address that, Your Honor, because the party's conferred. We'd suggest that the government go second after the appellant. Is that acceptable to everybody else? Okay, all right. All right, Mr. Panner, go ahead at your convenience. Thank you, Judge Hamilton, and may it please the court. In rejecting Viamedia's antitrust claims, the district court missed the legal significance of the unusual facts in the industry context. I'd like to emphasize three points, and the first goes to the nature of the interconnect. The interconnect is a joint selling arrangement among otherwise competing cable companies, and like the joint ticket in Aspen Skiing or the turntable in Terminal Railroad, it benefits all participants. Broader participation in the facility enhances its value. It preserves existing competition among the participants. It can't be duplicated, and the joint offering benefits consumers. Comcast's exclusion of cable companies' avails from the interconnect would have been simply self-destructive, if not for the promise of monopoly recoupment. Mr. Panner, if I remember correctly, similar cooperative ventures among competitors have been, like BMI or ASCAP, over the years have been subject to fairly close oversight by the Department of Justice. Is there anything like that, any history of that, with respect to these interconnects in the cable advertising business? Your Honor, my understanding is that there have been some attention paid to these arrangements, and there certainly have been investigations that have gone to other kinds of joint selling arrangements where it was seen to be eliminating competition. But the key about the interconnect, and it's not necessarily key to our point, but I do want to address it briefly, is that the interconnect does allow the cable companies to provide a better product in competition with, for example, broadcast media. Because if you think about how a cable system operates, an ad that runs on a single cable system will be seen by the customers of that cable system, but not the customers of other cable systems. And because these spot cable ads belong to the local cable system, if the local cable systems get together, then they can provide an offering to advertisers that will appear on all the cable systems of the participating companies. And that's good for advertisers, and it makes for a better product. And that's precisely why it was in Comcast's interest as an interconnect manager, as it repeatedly said, to include competing MVPDs in the interconnect. They simply wouldn't do it if they were represented by Via Media as their ad rep. And that kind of brings me to my second point, which I'd like to emphasize, and it goes to the function of the ad rep. In some ways, the ad rep is an unfortunate term. It's a misnomer, because the ad reps are not just sales agents. They allow independent companies to outsource all of the functions associated with the local spot cable business. So it's not just selling to advertisers, although it includes that, but it's allocating the ads, scheduling them, and doing the technical insertion. They have the equipment that makes sure that the ads run. They make sure they monitor that. They do the financial work around the billing, et cetera. So in other words, the ad rep is actually the spot cable business of its cable partners. And smaller companies can't provide those functions efficiently, so they have to rely on companies like Via Media or Comcast Spotlight. And so when Via Media is driven from the market, those independent companies become dependent on their biggest competitor, on the dominant cable company for this service, and they lose valuable promotional services that Via Media provides, and they also become less independent and less dynamic competitors to Comcast. Now the third point goes to what the district court believed was Comcast's business justification. Comcast persuaded the district court that it excluded Via Media in order to achieve vertical integration, but that's just not right. Via Media didn't provide any service to Comcast. It provided service to its cable partners, to Comcast cable competitors, in competition with Comcast Spotlight. Comcast was not internalizing any function that it used to buy from somebody else. Moreover, Comcast already had whatever vertical integration they're referring to. They already offered ad rep services and interconnect access in a bundle. They were able to offer both. And I can't emphasize this strongly enough. Excluding Via Media from the interconnect did not allow Comcast to do anything with regard to offering those services that it couldn't do before, that it wasn't already doing. And Comcast's avowed goal was to use control of the interconnect to eliminate competition from Via Media in ad rep services, and it succeeded in doing that. Now, these facts make clear why the district court was wrong to dismiss Via Media's refusal to deal claim. Via Media did not somehow plead that Comcast had a legitimate business justification for refusing to deal with Via Media. On that point, Mr. Panner, could Comcast have articulated any valid business purpose for refusing to deal with Via Media? Your Honor, they may be able to offer a valid business purpose, and that will be an issue that will have to be dealt with on remand. But, for example, suppose that Via Media was a bad partner. Via Media didn't do a good job, and as a result, advertisers were angry because Via Media wasn't inserting ads properly, and Comcast said, look, I can't continue to deal with you because you're not doing this right. Well, that's not the case. In fact, the evidence is that Via Media was a terrific partner and did its job extremely well. And what happens, and remember, this isn't a motion to dismiss, so the question is, what did Via Media plead? What Via Media pleaded was that Comcast did this to exclude Via Media from the market in order to take away that business because Via Media would be badly hobbled as a competitor. And, again, the court construed that at Comcast's urging as being about vertical integration. But that's just specious, or eliminating a middleman. But that's specious, especially on a motion to dismiss. So, for example, because Comcast was not using a middleman, Comcast cable competitors wanted to use a middleman so that they didn't have to depend on Comcast for ad rep services. And Via Media... At that point, you're relying on the FCC filings and some of the internal communications with WOW and RCN. Right. I think the strongest, there's considerable evidence about this, Your Honor, in the record. I would refer, I think that perhaps the best piece of evidence is in the appendix at 834 to 836. And this is when WOW is still represented by Via Media. And it goes to Comcast and says, please, let us back in. And Comcast says, sorry, as long as you're repped by Via Media, you can't get back in. If you want to deal with us for full turnkey ad rep services, then you can get back in. There is also the RCN FCC comment, which is quite on point. There was testimony. I can go on, Your Honors. I'm familiar with the evidence, but could I just ask, there's some debate in the back and forth about the desirability of so-called one-stop shopping. And could you explain, is there a difference between so-called full turnkey service and whether that is or is not linked with interconnect service? Sure, and I think that this is, again, this is the factual complication that I think lies at the heart of why this is a good claim. The interconnect full turnkey service basically is what I've described in terms of turning over that spot advertising function, the entire function of inserting the ads, deciding where to sell them, deciding how to allocate them, making sure they run, making sure they're billed for properly, et cetera. Essentially the business that the MVPD would otherwise do itself to another, to a company that specializes in that, that can provide that service to a smaller company. The interconnect, think of it as, suppose you had three adjacent cable companies in an area, and this is how they came to be. They're really not competing much, but they all serve the same metropolitan area, and they want to be able to run ads that run on all of them so that they can sell that to advertisers. They allocate some portion of their ads to the interconnect, which has a separate manager, and this is all pleaded, and of course this was a motion to dismiss. That's the historical basis for this. It's something where the participation of the MVPDs is what makes it valuable, and the function of it is the joint selling, so that it appears everywhere. But the insertion of the ad, that remains the responsibility of the ad rep or the MVPD that has the equipment. And so in this regard, I do think it's critical. At summary judgment, the district court thought that the fact that Comcast dealt with MVPDs in other geographic areas and would allow them to have interconnect-only deals was a fact that cut against Via Media's time claim. But it's really quite the other way around, because what's key there is that Comcast was perfectly happy to include the avails of the adjacent MVPDs in the interconnect, even though they were not doing full turnkey ad rep services. It goes to show that it was perfectly in Comcast's interest to include these avails. Where it was not facing competition in ad rep services. The only reason that appears in the complaint as to why Comcast wanted to eliminate Via Media, given that they benefited when these ads ran. They got substantial commissions when the additional ads were sold through the interconnect. The only reason they cut off Via Media was because Via Media was competing with Comcast in ad rep services. And it's dramatically clear with respect to the period between the termination of the original agreement and the bid for the ad rep services. Is that the period that was covered by the estimated millions of dollars in losses to all four companies? Yes, Your Honor. Okay. Could I ask you, Mr. Panner, to address the defendant's arguments that basically it's offering cheaper prices for these ad rep services? Sure. What is the evidence regarding that in the summary judgment record? And are we talking there about national averages or Chicago and Detroit in particular, or what? Sure. So I think that the best way to think about this is that what happens is that Via Media and Comcast, the evidence reflects their competition in Chicago and Detroit. And what happens is that after Wow and RCN use Via Media, they have a deal, and then they put out an RFP that may cover a number of different DMAs, but focusing on Chicago and Detroit, Via Media's offer was inferior to Comcast, but it was inferior because they didn't have access to the interconnect. They were not able to provide the revenues that come from participation in the interconnect to their customers. So in other words, the other point being that Comcast still faces this competition at that juncture. Via Media's still in the market. They're still trying to bid. They're still struggling to compete without access to the interconnect. They can't do it, and they are replaced. But now Comcast has no competition at all in providing these ad rep services to the competing cable companies. What did the MIECHE then point out? Well, wouldn't the prices therefore have risen and the prices have not? What's your response to that? The contracts that were signed at that time, 2015, they went into effect at the beginning of 2016. Those contracts are still in effect. What's going to happen when those expire should be of great concern because Comcast Spotlight now has a monopoly. But I do want to emphasize two other points about this. The disadvantage that the MBPDs suffer by not having effectively any choice in the provision of these services is that they can no longer choose a representative who's going to be unconflicted, who's going to be able to go out to potential customers and advocate for their partner. Comcast Spotlight won't do that because of their primary loyalty to Comcast. There's antitrust injury in being deprived of that choice and being forced, for purposes of the time claim, to be told, as they were, that if you want to have access to the interconnect, you must purchase ad rep services from us. That is time behavior and it creates exactly the problem that is the underlying concern of time law, which is that Comcast, in some ways through historical accident, had this monopoly facility, cooperative facility. It had control over it. And it used that control to force its competitors to stop doing business via media and instead to rely and depend and be beholden to Comcast for this function. Let me ask you about the interrelationship between the claims. If the court ends up agreeing with the district court that Comcast's refusal to deal was lawful, what happens to the tying and the antitrust injury claims? Sure. So I think that the district court, I think, got this right at the motion to dismiss stage and then, I think, got it wrong at the summary judgment. On tying. On tying, yes. In other words, the relationship between the claims, I would say. So I'd point the court to, I believe it's note 10 of the, no, I'm sorry, Your Honor. I'll get you the precise site. It's in the summary. It's in the original motion to dismiss decision. I'm sorry. It's in this short appendix 108. It's the motion to dismiss opinion at 3809. And what the court said there is that I understand that some of the conduct that's supporting the tying claim is a refusal to deal via media. And that was Comcast's argument is they said, look, this is just a refusal to deal. Forget about everything else. And the court said, look, I'm not going to allow the refusal to deal claim to go forward. And I understand that part of the conduct underlying the tying claim is this refusal to deal. And that you dealt with them later under a full turnkey arrangement. But the potential problem with that conduct is that it provided this access only after allegedly coercing the MVPDs to accept Comcast Spotlight services. I don't want to overemphasize this, because the point is that then on summary judgment, the court said, well, no, even though I'm going to reject the argument that because via media is acting on behalf of the MVPDs, that a refusal to provide interconnect access for these MVPDs avails when they're represented by via media, that doesn't count as refusing to provide it separately if they'll contract directly. But I think that what I've said about, again, the functional relationship between via media as an ad rep, as the spot cable avail business of the MVPD, goes to show that when Comcast denies access to via media, what it's really doing is saying, MVPD that's represented by via media, you cannot have access to the interconnect as long as you are represented by via media. So if you want access, you must get ad rep services from Comcast. And that's exactly what they said, and that's exactly what they did. So I think that that was sufficient to support the time claim. And as I say, I think that it's also squarely within what everyone agrees is the standard for an unlawful refusal to deal. What's interesting is the only basis, the only basis, on which Comcast defends the district court's judgment is that there was affirmatively pleaded a business justification. Via media did not plead a business justification for the refusal to deal. It pleaded that the refusal to deal was irrational, but for its tendency to prevent via media from competing in the market and driving it from the market. Mr. Panner, can I step back and ask you to address a couple of broader antitrust questions here implicated by this case? One, could you explain to me, in essence, how you think a local monopoly in ad rep services for these avails winds up hurting the interests of ultimate consumers? And second, could you address, in essence, the problem in refusal to deal cases with what injunctive relief should look like and the challenge of monitoring relief? So with respect to the first, with respect to the ad rep services market, the consumers are the competing MVPDs, and so they're hurt because they don't have the choice to have an independent ad rep. There is also indirect harm to consumers who purchase MVPD services because those MVPDs are going to be less vibrant and less capable competitors when they have to rely on the dominant competitor to get the revenues for these interconnect ads, which is, again, this was something that, there's record evidence that there was testimony that the independent cable companies didn't want to have to rely on Comcast for this. So that's, with regard to advertisers, I think that there's a benefit to having the ad rep selling local ads in competition with Comcast Spotlight because advertisers have this additional outlet, additional salesmen who are coming to them. If you think about your local pizza joint or your local dentist who wants to be able to advertise on cable to a small neighborhood, that's the kind of thing that ViaMedia is, ViaMedia's ad salesmen were selling. And when that goes away, the opportunities for advertisers are also restricted. Now, with regard to the injunctive relief, this is the case that I think reflects the circumstances where administrative concerns are really minimized because, as Comcast admits, it's doing business with MVPDs on an interconnect-only basis. It has a bunch of contracts that are like this. And so certainly there may be a dispute as to which contract is the most applicable and what's exactly the correct rate. And there may be a disagreement about that. But essentially what the court can order is you need to provide access on terms comparable to that that you provide to non-competing MVPDs and other DMAs. And if there's an ultimate dispute about that, the court may have to resolve it. That happens. But the point is that there's a basis. And there's also the prior contract between the parties. And Comcast, when it terminated the contract, didn't say, we have this problem with it, we'd like to change it in this way. What they said was, we're done. We're not dealing with you. We're not dealing with middlemen. And then later there was an unreasonable offer. But at the time that it was terminated, there was no offer. There was just a flat refusal. You understand you're well into your rebuttal time. Thank you, Your Honor. Thank you, Mr. Panner. We'll next hear from the government, as amicus curia, from Mr. Levin. May it please the court, Nick Levin on behalf of the United States. I am here for the limited purpose of asking this court to hold that for a refusal to deal to violate Section 2 of the Sherman Act, it must make no economic sense but force anti-competitive effect. So that was the position that the government argued in the Trinko case, right? Yes, Your Honor. And the Supreme Court just didn't go quite that far, did it? We asked the court to articulate it as the general test, and it didn't say this was the test for one in the test, that's why we're here. But it did strongly support the test, in particular in how it said Aspen skiing is at or near the boundary of liability. And then in describing the facts of Aspen skiing, it said the significant fact in Aspen skiing was there that Aspen skiing showed a willingness to forsake short-term profits to achieve an anti-competitive end. Are you familiar with the evidence of similar intent here? We're familiar with the pleadings, and we're familiar with Via Media's allegations that it is. We're not here to advocate a pleading standard. What we'd like to do is discuss how the test works, and we think that's important because while all sides have said that they agree with the test, they actually are applying it somewhat differently. So what I'd like to do is discuss how it properly works and then explain why both Via Media and Comcast are being slightly wrong in their expositions. Before we quite get there, my question goes to formulation. Your brief talks about no economic sense test. Is there any daylight between that and now Justice Gorsuch's irrational but for anti-competitive effect formulation in Novell? Is it the same? Is it slightly different? I believe he was intending to capture what was our no economic sense test. It sometimes has been articulated differently. Reid and Hovenkamp, they have a formulation that focuses on the effect on rivals. We believe it's best to focus on the effect on competition because the antitrust laws protect competition, not particular competitors. But I don't know any distance between us and Novell. But for how the test applies, I think the test is an objective test. It looks to whether refusal to deal would be profitable apart from any reduction in competition. If it would be, then it's lawful under Section 2. But if not, and it would not be profitable unless the refusal to deal also reduced competition, then the Sherman Act may apply. Now Comcast has suggested here, and I'll take them first. As I said, both sides, I didn't get it wrong, that the test is satisfied whenever there's a slight pro-competitive benefit or efficiency gain. That's wrong. The gains must be enough to offset the cost. Otherwise it wouldn't be rational. So you do think there should be some balancing? There's a balancing of the cost. Is it profitable? So, for example, if a refusal to deal would cost a firm $100 in terms of lost revenue, but save it $1 through efficiencies, no rational firm would do it. So it does ascertain from an objective standpoint whether the conduct would be profitable. But it doesn't then, if it is determined that the conduct is profitable, it doesn't then go further and analyze pro-competitive and anti-competitive effects. It's profitable for legitimate reasons. Is the government's test one that could be applied meaningfully at the pleading stage? Yes, Your Honor, and I think a good example of that would be the Christie's case from the Tenth Circuit. In the Christie's case, the evidence showed that the Deer Valley Ski Mountain Resort, they developed the mountain, and they wanted to offer ski rentals at Mid-Mountain. Sorry, I've been tempted to ask you all whether Section 2 only applies to ski mountains in your view at this point, but we'll go forward. Sorry. Yes, it does apply beyond ski mountains, Your Honor. But there, Christie's... So Christie's, which had been offering it, the mountain resort said you can't do it anymore. It exercised a restrictive covenant saying we're going to sell our own ski mountains. And there, as the court said, well, yes, it's clear that the Deer Valley Mountain wanted to make more money through selling ski rentals. It could otherwise raise lift prices. It could otherwise do all sorts... It could do other things to raise money, but this was the means it chose. And it's an important principle of antitrust law to allow firms the freedom to choose with whom they will and will not deal. And here they wanted to deal with it themselves. So I think, yes, it can be applied at the pleading stage. To get on to the problem with Via Media's position, on pages 36 and 37 of its brief, it suggests that it can prevail without saying anything at all about possible reasons for this other than an anti-competitive effect. And we think that's wrong too. It's the plaintiff's burden to plead and later prove that the refusal to deal would make no economic sense but for its anti-competitive effect. And if there's an obvious explanation for it, the plaintiff needs to account for it in the pleadings or later at trial. It needs to account for it in its proof at trial. Can I ask... Well, you came a long way, so... And it's an important case. Do you think, Mr. Levin, that the Matsushita summary judgment standard should be, in a Section 1 case, should be applied at the pleading stage of a Section 2 case? We haven't taken a position on that. I saw it in the amicus, but I would note in cases like Visa v. Osborne, we filed an amicus brief in the Supreme Court suggesting not to apply the Matsushita standard outside the context. That was a different case involving different standards, but I would note... But we don't have a position, but I do note that we have expressed that position. Okay. And you note in your amicus brief that the supreme evil addressed in antitrust law is bringing competitors to collaborate together in an anti-competitive way. Does the government have any concerns about the tying arrangement here, bringing MVPD competitors closer together, where the dominant cable company in a market, in essence, requires its competitors to buy their ad rep services from it? We haven't taken a position on the tying claim in this case. We always have a concern with anti-competitive problems, though, or potential. That's it. Other questions? Okay. Thank you very much, Mr. Levin. For the defense, we'll now hear from Mr. Burke. Good morning, Your Honor. May it please the Court. Last year, in the Authenticom case, this Court said that a monopolist is almost never required to deal with its rivals. And in a similar vein, the Tenth Circuit, in the Nobel case, said that a plaintiff seeking to compel its rival to deal with it must pass through a narrow-eyed needle. ViaMedia's claims in this case come nowhere close to meeting that searching and compelling standard. What happened in this case is something that is very routine and that happens every day in the U.S. economy. A firm that was once working with a middleman decided that instead of continuing to work with that middleman, it would develop a direct relationship with that middleman's customers. Comcast and ViaMedia compete all throughout the country, and there was only one exception to that. For a period of time, Comcast dealt with ViaMedia to acquire access to advertising inventory that ViaMedia acquired for its customers. That one exception was pursuant to a contract that had a finite duration, and that contract actually expressly provided that Comcast had the right at the end of the contract to pursue ViaMedia's customers directly, and of course that's what Comcast did. What ViaMedia seeks to do in this case... But you did that by telling those customers that if they wanted access to the Internet Connect, they had to deal with you, right? We have evidence of that. What I think Comcast said was it would not do deals with intermediaries, that it would have to... But it would not provide InterConnect services unless the competitors also bought their ad rep services from Comcast. That was the evidence, right? I know you may want to dispute it, but we're here on summary judgment. So we're changing the tying claim away from the refusal to deal. They're so closely related. I agree with that, certainly, Your Honor. What I'd say on that is that I think that evidence is perhaps ambiguous. The broader record in the case demonstrates that RCN and WOW both testified they never sought to get the tying product on a standalone basis. You had told them you wouldn't do it. Right. So this sounds like a summary judgment, like the kind of factual issue that's not suitable for summary judgment. I would direct, Your Honor, to the Will case where this court said that if someone says, you know, I'm not going to sell the chassis to a car separately from the chassis, that is not tying if no one wants to buy the chassis separately. Of course not. But all over the country, we have evidence that interconnect services and ad rep services are divided. And you all have contracts where you provide only interconnect services, right? That is correct. And that was happening in Chicago and Detroit before you made the decision to require RCN and WOW to buy ad rep services from you if they wanted access to the interconnect, right? So I think the norm is full turnkey. There are a few exceptions where... Full turnkey is not necessarily the same thing, as I understand it. Full turnkey is... RCN and WOW were buying full turnkey at first from VIA Media, if I understand. Correct. And then they were dealing with you all through the interconnect, right? Well, no, they were not dealing with Comcast. They were dealing with VIA Media. So VIA Media... I meant VIA Media was dealing with Comcast for the interconnect services on behalf of their clients. And that's exactly why there was disintermediation in this case. There was an extra margin that VIA Media was charging its customers, and then Comcast charged VIA Media a margin. So by eliminating the middleman, that's why the court said this is a prototypical valid business purpose. Disintermediation. This is an extraordinarily different kind of market, though, where you've got competitors. What you're doing is controlling access to this cooperative venture. It's not as though you've got a natural monopoly, as in the PortDoc case. It's not clear that that's... one way or the other in the record. Comcast has bilateral relationships with other MVPDs. There's no board of directors for the interconnect. Comcast operates it solely. It operates the interconnect and makes all the decisions unilaterally. So there's no joint activity here. In terms of the refusal to deal, it's very clear that... if there is an obligation remaining in the law, it's a very narrow one. That's correct. I think not probably limited to ski mountains, but we'll see. But if we go through the factors that were addressed in Aspen and Trinko's basis for distinguishing Aspen and the Novell opinion, as all fairly authoritative in this, we've got a long-term business relationship between Comcast and Via Media preexisting, right? To produce a joint product. In one limited area. In Chicago and Detroit. Right, and pursuant to a finite contract. You've got a relationship that existed absent any statutory or regulatory obligations, unlike Trinko, right? That's correct. So it was a voluntary deal, which antitrust law would ordinarily treat as presumably profitable and pro-competitive, correct? For the duration of the deal. It was a fixed, finite duration that provided at the end, that Comcast expressly had the right to pursue RCN and WOW. And then we also have a reversal, of course, at the end of that, with internal projections about how many millions of dollars your reversal, of course, would cost you, Via Media, and your customers, right? Correct. And that was expressly foreshadowed when Via Media signed that deal in 2003. That that exact course of events was likely to happen. So that makes this much like Trinko's lawyers. So you were going to cut them off to spite your own face, to accept losses in order to be able to cut them out? Well, as Novell explains, it's frequently the case that when one terminates a course of dealing, there may be temporary losses. That's not sufficient to state an antitrust claim. Comcast eventually got deals directly with RCN and WOW, and those are far more efficient deals. And the record is clear, by the way. Comcast has consistently reduced prices throughout the relevant period and pays better... In Detroit and Chicago? In Detroit and Chicago. That's why they switched to Comcast. Where do we find that? The report of Professor Dennis Carlton, which is part of the record and is in the appendix, goes through this and demonstrates conclusively that, you know, it's interesting... Is that part of the summary judgment? It is part of the summary judgment record. Figure 1 of his report shows that consistently throughout the relevant period, Comcast paid better splits to the MVPDs and that consistently Comcast paid better splits throughout the country than VIA Media does. Comcast is the more efficient competitor. That's why they won the business. And that's a legitimate... Are you disputing, though, that you told RCN and WOW that you wouldn't provide services to them that they needed through the interconnect unless they bought from you? What we told them was that we would not do deals with intermediaries. We wanted to do a direct deal... What's the difference between that and what I just asked you? Because I think it is a statement of fact that they want to do direct deals with those folks and that's a legitimate decision that Comcast made. So in terms of the Aspen and the Trinco factors, we do have... I would agree. I don't think it's either necessary or sufficient to have evidence of a deliberate infliction of financial loss, but it certainly is unusual evidence. We've also got evidence of unhappy customers who wanted to be able to buy ad services from somebody who was not their competitor, not their dominant competitor in the market. I understand you may want to argue about the significance of that, but it's summary judgment. Well, what I would say is, Your Honor, what we have in the record is evidence that I think what they testified was that everything else being equal, they might prefer to deal with Via Media, but Comcast was so much better in its offers that they decided to switch to Comcast. And why is that? Because Comcast is the more efficient competitor. Let's come back to the basis here. What Via Media is asking is that a deal that was struck in 2003 be extended in perpetuity. Their damages model in this case assumes exactly that, that a deal negotiated in 2003 is going to be extended to 2040. And then, of course, we heard from Mr. Panner that we can work out what the price is going to be. What their own expert demonstrates is that the range of revenue splits goes from 55% to 90% on interconnect-only deals. There's a wide range in between those things. The court is going to be set up as a public utility commission if it awards the relief that Via Media says. Let's explore this idea. Why did it make business sense originally in 2003 for them to strike the deal? And then what changed on June 1st of 2012? You know, that's not in the record to be candid, Your Honor, but I think what we surmise is that at that point, Via Media had locked up RCN and WOW in long-term deals. So there was no way for Comcast to get their business. And that is pleaded in the record that they had long-term deals with RCN and WOW. So, of course, at that point, Comcast has no choice, no ability during that time period to go direct. But at some point, those long-term deals are going to expire, and Comcast wants to be able to get direct relationships with those customers. Mr. Burke, directing your attention then to that 2012-2015 time frame, is there a tying concern during at least that time frame that Comcast is preventing customer access to the tying product while still under contract with Via Media to receive the tied product? So, I think what happened in that time period, of course, Comcast would have preferred to sign up RCN and WOW immediately. But Via Media's own contracts made that impossible. Comcast had to wait. And there was actually one request for proposal by WOW in that time period. And actually, interestingly, WOW renewed with Via Media, even though Via Media didn't have access to the interconnect, which I think undermines the view that the interconnect is somehow essential to competition. At the end, Comcast offered a better deal. The testimony was unambiguous from both RCN and WOW. They never wanted to get interconnect access on its own. And I think to focus on that, if Comcast were ordered to do a direct deal with RCN and WOW that's interconnect only, that would do no good for Via Media. That's not what they want. This is the ingot example from Judge St. Eve's decision. What they want to do is force Comcast to sell interconnect services to Via Media so that Via Media can then bundle those services and resell them to their end customers. That's the tell here. This is not a real tying case. This is about disrupting vertical integration and forcing a firm to sell an input to a rival so that rival can then compete more effectively. And that's the Aerotech case from the Ninth Circuit, the Data General case from the First Circuit. Those are both cases where a rival seeks to use tying law to force a firm to share the source of its strength with it and then to resell the product in competition. So I think those are very important cases and that's exactly the template that we have here. Mr. Burke, what does the record show about the evidence of investments by Comcast into the interconnect service? I think that the testimony of even one of Via Media's witnesses was that there was billions of dollars of investment over the years. In the interconnect? Well, across the country, not just in these particular markets. But of course, remember, there are predecessor companies that also had a role in creating these interconnects which Comcast then paid money to acquire. So there's a substantial investment in terms of technological capabilities. Here in Chicago was one of the first interconnects. It was necessary to have fiber optic cable all throughout the region so that you could connect these cable companies together. So there was substantial investment and there's substantial ongoing investment. How much infrastructure is needed just to link the companies to each other? I think the technology continues to evolve. Obviously, when it was 20 years ago, the technology was not as advanced. There was a lot of expenditures associated with that. Now what we have is different kinds of ads. So historically, you just had linear ads. Now you can have digital ads that are inserted in a dynamic way. You're trying to have targeted ads that can actually go to customers. The advertising business is evolving rapidly to try to compete with the Googles and Facebooks of the world. This is a capital intensive and important industry. I'm not sure that's exactly relevant to the dispute at hand, but it is certainly the case. One thing I wanted to address is Mr. Panner's comment that this is a motion to dismiss. And of course, we agree and we think that it's clear on the face of the complaint what Comcast did and there's really no disagreement about it. We're not sure what factual development is necessary and frankly, we're not sure what the purpose of a trial would be. There's a straight legal question that's presented to your honors. Comcast conceded... You don't think we should grant summary judgment against you? I certainly don't. Okay. But I think the case law in this circuit makes clear that removing an intermediary is a prototypical pro-competitive benefit. That's exactly what PortDoc stands for. That's what Jack Walters stands for. That's what Chrissy Sports stands for. In each of those cases, and two of which were on motion to dismiss, the court found that disintermediation was... In none of those cases, though, do you have this phenomenon of the dominant, or rather, frankly, the party   interconnect in these markets using that power to force its competitors to buy certain services from it that otherwise would be a threat to their business and their ability to be available from others in the market. That's a very different structure from the vertical integration of aggregate in a local market like New York. Right. Well, I still don't think the fundamental benefits of vertical integration are any different, though. What we had here is two margin... Well, this way, you get to kind of bear hug your competitors in the MVPD market. Well, I think, as Mr. Pattern indicated, we're not really competitors when it comes to the ad sales market. These are compliments to each other. In the MVPD market. No, understood, but what... The whole point that Mr. Pattern explained originally was that there's a benefit to bringing this advertising inventory together that actually helps advertisers. So we're not really... In the interconnect, right? Yeah, that's exactly right. And that's why the interconnects make so much sense, right? Exactly. And why do ad rep services have to be tied to that? Well, again, we dispute that, Your Honor, and we don't think the record supports that. Well, the plaintiff has offered evidence saying that you told RCN and WOW that you would not provide them with access to the interconnect unless they also bought ad services from you and that they were unhappy about that. Now, I know you want to dispute that, but I see that evidence and it's pretty unusual evidence in a tying case that's been dismissed. It's equally consistent with unilateral conduct that's not tying. I think it's a truism to say, if you want to deal with Comcast, you have to deal with Comcast. That's all Comcast was saying. In two different markets. In those markets. Two different product markets. Well, I think that that's the confusion here. What I would focus on, Your Honor, is what does VIA Media really want? They don't want Comcast to sell interconnect-only services to RCN and WOW. That's not the relief they seek. It wouldn't do them any good. All of that record evidence is actually misdirection. What they said in their brief is this, and it's pages 44 and 45. Quote, by terminating its arrangements with VIA Media, Comcast refused to provide interconnect services to WOW and RCN. That's just a non sequitur. What they say is, by refusing to deal with them, somehow that's tying an exclusive dealing with respect to RCN and WOW. That turns tying law on its head. That's exactly what the plaintiff in Aerotech tried to do, and the court properly saw through that gambit. It's also what the plaintiff in Data General tried to do. Again, what VIA Media says, that conduct was therefore not only a refusal to deal with VIA Media, but integral to Comcast's tying. Again, they're deliberately conflating the refusal to deal with VIA Media with tying. Again, if Comcast offered interconnect services on a standalone basis to RCN and WOW, something they never wanted, it still wouldn't solve the problem here. Let's be clear, RCN and WOW were deposed. They never said, yeah, I didn't ask for interconnect services because Comcast told me I couldn't get it. They always had full turnkey with VIA Media. It's the industry norm to do it that way. It's certainly, there's no evidence of independent demand from those players that they ever wanted to get interconnect services on a standalone basis. Under the Will case, that's dispositive. It's game over for those kinds of tying claims. I wanted to turn to a few other, again, matters, Your Honor. One other, I think, to step back and look at the complaint as a whole, VIA Media pleads that it operates in 70 DMAs in the United States. It pleads that it has  in five of them. What does that tell us? It is not the norm for VIA Media to have access to the interconnects. It is, in fact, typical that VIA Media does not have access to the interconnect throughout the country. It competes successfully. We know, for example, in Hartford, which is part of this case, VIA Media does not have access to the interconnect, yet Frontier has re-upped with VIA Media multiple times. Number one, it's certainly not unusual or rare for VIA Media not to have access to the interconnect. Let's turn back now. What VIA Media's relief they're seeking then is essentially to say, we're going to take one sliver of an exception that Comcast made in 2003 and project that all to 2040, which is what their damages model does, that in perpetuity, effectively, Comcast is going to have to deal with VIA Media on those terms frozen in time, even though we know that the cable business is changing rapidly and dynamically. We're going to freeze in time what you did in 2003 and lock that in forever. I would also note that VIA Media acknowledges that it needed to plead recoupment and establish recoupment, but there's nothing in the complaint and there's no evidence developed in discovery that shows that there's going to be recoupment. That's just asserted blindly, but they acknowledge that's a critical part of their refusal to deal claim. I would, again, with respect to the finite duration of this contract, I think Chrissy Sports is directly on point. That court placed great emphasis on the fact that the contract, from the very beginning, had a clause in it that made it clear that Chrissy Sports' time on the mountain was finite and could be terminated. And that's exactly the facts here. The 2003 contract said it's going to be finite in duration and Comcast has the right at the termination of that contract to pursue RCN and WOW directly. Now, VIA Media says, well, look, there was this hiatus then. There was this gap of three years where Comcast was losing all this money while it waited to try to actually achieve that disintermediation. I think there's a few answers to that. First, VIA Media was the reason for that. They had locked into place RCN and WOW with long-term contracts, so Comcast couldn't go directly to them until those contracts expired. In addition, and I think that's the principle and important distinction there, that there was no ability to go after those folks until VIA Media actually permitted that direct business to occur. So I think that we've sort of gone back and forth, Your Honors, between the tying claims and the refusal-to-deal claims. I'll sort of tie up the refusal-to-deal discussion and maybe spend the last few minutes on tying. The refusal-to-deal doctrine here is incredibly hostile to that kind of theory. This would be, if this Court were to reverse on this, it would be almost unprecedented in the post-Trinco world for a case to proceed on a unilateral refusal-to-deal. There are multiple important differences from this case, from the Aspen speeing case. The Supreme Court in Aspen speeing said that Aspen speeing did not even offer any efficiency rationale whatsoever for its conduct. This case is different. On the face of the complaint, there is an efficiency rationale that's present. And there's really no need for additional discovery. The fact is, VIA Media had full discovery on the refusal-to-deal claim in this case as well because it litigated its tying claim as if it was a refusal-to-deal claim. The District Court properly recognized that VIA Media equates those two things. Now, it was true that in the District Court's original motion to dismiss, the District Court distinguished it. The problem is that VIA Media didn't follow the District Court's direction. Instead, they intentionally conflated a refusal-to-deal with tying, and the District Court then properly concluded that it was dismissed. So there was full discovery in this case. There's nothing to remand back for discovery. There's no discovery that contradicts what VIA Media pleaded in its original complaint, which is that Comcast wanted to have a direct relationship with it and with VIA Media's customers, and so therefore it terminated its deal with VIA Media and went direct. So I think that should be QED from the perspective of the refusal-to-deal claims. One final thing that I'll say on that. I think in both Novell and in this Court's decision in Schor, there is an admonition by the courts that refusals-to-deal are a very unique species of antitrust claims. They're almost like predatory pricing. Very, very rare abyss that there's a valid refusal-to-deal claim. And the Court says if you're in doubt, you should err on the side of avoiding false positives, meaning mistaken impositions of liability for refusals-to-deal because if you don't do that, then you're going to end up forcing rivals to cooperate with each other, you're going to interfere with incentives to invest, and then you're going to suffer. You're already forcing rivals to cooperate with you, right? Um, as I said, Your Honor- Buying their ad rep services from you. They're free to continue to do business with Via Media. In fact, they have. As I said, in Hartford, the frontier, despite the fact that they don't have access to the interconnect, continues to do business with Via Media. So if they prefer to have business dealing with Via Media, the MVPDs are free to do that. But I think those cases are important. They say that when in doubt, err on the side of not imposing a duty to deal because of all of the serious problems the Supreme Court has recognized about those kinds of claims. Um, one last thing on tying, and I just want to sort of focus this on the antitrust injury part of tying. Um, the damages report in this case is the clearest proof that there is no daylight between the refusal to deal claim and the tying claim. Uh, the plaintiff's expert, Professor Lees, said that his entire damages estimate is based directly or indirectly on Via Media's lack of access to Comcast Spotlight's interconnects in Chicago, Detroit, and Hartford. That's, that's it. There is, and the model itself, if you break it down and look through each of the components, each component is derived directly from the refusal to deal. There is no tying claims. I recognize Your Honor's questions about the testimony in the record, and we could debate that. In fact, it's irrelevant. Because, in fact, what they're interested in is compelled dealing with Via Media. They don't care at all about whether Comcast would sell interconnect services independently to RCN and WOW. And that's, that becomes most clear in the, in the damages and liability reports, and actually the testimony of Via Media's, uh, CEO, who also said the entirety of the damages that Via Media suffered were the result of the refusal to deal with Via Media. It's really important to differentiate between a legitimate vertical integration and tying. Lots of courts have said that like it's my party. And that, that the problem is, is that vertical integration is usually pro-competitive. And so we have to be very careful in not conflating a legitimate vertical integration with tying. Um, so for all those reasons, uh, I, I urge the court to affirm the, the district court below. Thank you, Mr. Burke. Rebuttal, Mr. Panner? Um, thank you, Your Honor. Uh, I do want to, because it was repeatedly said that, um, Comcast terminated dealing with Via Media in order to be able to seek direct deals. I just want to show    from going after whatever direct deals that are being made by Via Media and, and, and, and, and, and, and, and, and, and,  and,       and, and, and, and, and, and, and, and. Um, there's simply nothing, you know, Comcast may come in and compete with Via Media and they may beat us. Okay? And the MVPDs can make that choice. But what Comcast can't do is to take, is to use its monopoly control of the Interconnect and say to, um, MVPDs, you can't get in unless you deal with us for ad rep services. We were just told, however, that, that, that you all don't really need that access to the Interconnect, that you don't have it in a lot of different markets and you compete for, effectively there. What's actually pleaded is that there is no market where we sought Interconnect access where we were denied it other than Comcast markets. Um, and there are markets that don't have Interconnects, uh, at all, but smaller markets often, often don't. So, the, the fact of the matter is that, um, the suggestion that there's any implication from the pleading, um, that via media has been denied access to Interconnects, um, by other, other dominant MVPDs is not, is not warranted and it's not actually the evidence. Um, uh, also, you know, again with respect to vertical integration, the invocation of vertical integration as I, as I've, as I mentioned and I just want to stress because it's critical. Via media was not providing services to Comcast that Comcast chose to internalize. Via media was providing a service to competing MVPDs who wanted to outsource their ad rep services. They're still outsourcing their ad rep services, but they no longer have the choice to, um, provide those, you know, to get those services from via media because of Comcast conduct. Quickly on Christie Sports and Aspen Skiing. Christie, in Christie Sports the problem was there was no claim that the defendant was terminating a profitable business, um, with the plaintiff or that there was going to be any short term sacrifice of profits at all. It was taking over a profitable business that it had temporarily allowed, um, Christie Sports to carry out on the mountain and as to Aspen Skiing, it's not true that the defendant said I did this to, um, trouble my competitor. They didn't not offer a justification for their conduct, but they, they did offer justifications. The jury rejected them as not being valid and it's the same here. That, um, it presents a question of fact, um, that needs to be, um, decided, uh, after a trial. Thank you very much. Thanks to all counsel. The case will be taken